UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

NANCY P. MICHAEL,                        )
       Plaintiff,                        )
                      )
      vs.                        )                1:08-cv-1432-LJM-DML
                      )
ELI LILLY AND COMPANY,                   )
       Defendant.                        )

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on defendant's, Eli Lilly and Company ("Lilly"), Motion

for Summary Judgment (Dkt. No. 38).  On October 20, 2008, plaintiff, Nancy Michael

("Michael"), filed a complaint alleging retaliation in violation of the Family and Medical

Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*, and retaliation in violation of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.[1][2]  Lilly now moves the

Court to enter judgment in its favor on Michael's claims, asserting that there are no genuine

---

[1]  The ADA Amendments Act of 2008 ("ADAAA"), which amended the definition
of "disability" in the ADA and gave the EEOC authority to interpret the definition,
became effective on January 1, 2009.  Because the ADAAA is not retroactive, and the
events leading up to and including Michael's termination occurred well before 2009, this
Court evaluates her claims using the statute, regulations, and case law which existed at
the time the complained-of actions occurred.  *Gibson v. M & M Serv. Station Equip.
Specialist, Inc.*, 2009 WL 899660, at *5 n.1 (S.D. Ind. Mar. 30, 2009) (citing *Kiesewetter
v. Caterpillar, Inc.*, 2008 WL 4523595, at *1 (7th Cir. Oct. 9, 2008)).

[2]  Michael's complaint also alleged age discrimination under the Age
Discrimination and Employment Act, but this claim was dismissed by the Court pursuant
to the stipulation of the parties.  Dkt. No. 37.

issues of material fact and that Lilly is entitled to judgment as a matter of law.[3]  The Court has considered the parties' arguments and, for the reasons set forth below, Lilly's Motion for Summary Judgment (Dkt. No. 38) is **GRANTED**.

## I. <u>BACKGROUND</u>[4]

Michael began working for Lilly in February 2001 as a Senior Training Associate. Michael Dep. at 18; 30.  Prior to working at Lilly, Michael worked for several years at Ernst & Young, and spent the year prior to working for Lilly with an enterprise of Ernst & Young called Intellinex.  *Id.* at 15.  While at Intellinex, Michael developed internal training materials for use by the company's clients.  *Id.* at 15-16.  One of the clients that Michael performed contracted work for was Lilly, in the company's Indianapolis facility known as LTC North.  *Id.* at 16.  The supervisor of the group in which Michael work encouraged her to apply for a job with Lilly.  *Id.*  Michael applied for a position titled Senior Training Associate in the Global Business Integration Project (GBIP) group, and, after several rounds of interviews, was hired for the position on February 5, 2001.  Michael Dep. at 17-19, 30.  Michael worked in the GBIP group until the end of 2005.  *Id.* at 32.  During that time, she received satisfactory performance reviews on an annual basis.  Pl's Exs. E, F, G, and H.

On September 20, 2002, while employed with Lilly in the GBIP group, Michael received a warning regarding her "continued violation of Lilly's parking policy while on Lilly

---

[3]  In response to Lilly's motion, Michael concedes Lilly is entitled to judgment as a matter of law on her claim for disability discrimination for failure to accommodate.

[4]  The disputed evidence is described and considered in the light most favorable to the nonmoving party, Michael.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).

premises." Michael Dep. at 47; Def.'s Ex. 3. Specifically, in the year prior to receiving the warning, Michael had received five parking tickets, had a parking boot placed on her car, and had her car towed due to parking in unauthorized parking spots. Michael Dep. at 47-48; Def.'s Ex. 3. Michael stated in her deposition that although she "deserved each and every ticket," parking at Lilly was a hassle and she sometimes was forced to park in visitor parking. Michael Dep. at 48. After receiving the warning, Dan Neumann, Human Resources Representative, told Michael that the warning would stay in her personnel file for two years. Michael Dep. at 49. He also told Michael, "[D]on't worry. Lilly's never fired anybody for parking." *Id.*

In the fall of 2005, Michael began looking for other employment at Lilly because the GBIP project was coming to an end. Michael Dep. at 32-33. She interviewed with Rachelle "Shelly" Verkamp ("Verkamp") for a position as a Senior Training Associate with Lilly's Parenterals Group, but was not offered the job. *Id.* at 33. Thereafter, Michael interviewed with Charlotte Hawthorne ("Hawthorne") for a position in the Performance Improvement Group, also known as the IndyDry facility ("IndyDry").[5] *Id.* at 33-35. Michael was hired in December 2005 as a Senior Training Associate at the IndyDry facility, with a start date in January 2006. *Id.*

Hawthorne moved to another position within Lilly prior to Michael's start date at the IndyDry facility. *Id.* at 36. Therefore, from the time Michael began work in January 2006 until Hawthorne's replacement was hired, a period of approximately two months, Michael did not have a supervisor. *Id.* On or around March 1, 2006, Verkamp was hired as

---

[5] IndyDry is a pharmaceutical manufacturing facility where dry ingredients are combined to produce various Lilly medications. Michael Dep. at 35.

Hawthorne's replacement and remained as Michael's supervisor throughout the rest of Michael's employment with Lilly.  *Id.* at 43.  Michael's main contact in Human Resources during this time was Michael Lakin ("Lakin").  Lakin Aff. at ¶ 2.

In her position as a Senior Training Associate, Michael was responsible for updating and creating training modules for Lilly employees at the IndyDry facility, and for tracking the training history of the employees.  Michael Dep. at 36-37.  Part of her job required her to obtain feedback on the training modules from the employees operating the machinery.  *Id.* at 65.  Michael did not have scheduled work hours.  *Id.* at 75.  Lilly operates under a flex time policy, whereby employees can obtain permission from their supervisors to work an alternate schedule, such as four ten-hour workdays instead of five eight-hour workdays.  *Id.* at 76; Def.'s Ex. 9, at 5.  The policy provides that core hours are from 9:00 a.m. to 3:00 p.m.  This means that arrival times are between 6:00 a.m. and 9:00 a.m., and departure times are between 3:00 p.m. and 6:00 p.m.  Def.'s Ex. 9, at 5.  Lilly professionals in the IndyDry facility generally begin the workday between 8:00 a.m. and 9:00 a.m., and end around 5:00 p.m.  Michael Dep. at 75-76.  Michael sometimes worked on weekends, came in early, or stayed late in order to finish projects.  *Id.* at 75-77.  Other professional employees in the IndyDry facility arrived for work later than 9:00 a.m.  *Id.* at 81.  Prior to February 20, 2007, Michael had never been informed by a supervisor that she was tardy or otherwise short on hours.  *Id.* at 76.

Once employed at the IndyDry facility, Michael received several more parking tickets.  Michael Dep. at 50.  Michael explained that part of the reason she parked in unauthorized spaces was that she had seen other employees successfully park in unauthorized "interplant" visitor spaces or spaces reserved for Lilly's directors without

4

getting ticketed.  *Id.* at 47.  Additionally, Michael had been having trouble with her legs and parked close to the door in unauthorized spaces to reduce the walking distance into the building.  *Id.* at 51.  Michael's doctor informed her doctor that she had arthritis in her spine and peripheral artery disease, which prevented her from walking long distances without experiencing a burning sensation in her legs.  *Id.*  Michael told Verkamp about the trouble she was having with her legs, and Verkamp suggested that she obtain a handicapped parking permit.  *Id.* at 52.  However, Michael did not want to be labeled "handicapped," and one doctor had told her that it would reduce the tingling in her legs if she made sure to walk every day.  Therefore, Michael parked in the back parking lot.  *Id.* at 53-54.  Nevertheless, on January 22, 2007, Michael received an email containing a notice of six parking tickets and warning her that her car would be towed if she received another ticket.  Michael Dep. at 55-56.  A human resources representative then forwarded the email to Verkamp.  *Id.* at 55.

Michael received her first performance review from Verkamp in February 2007.  Michael Dep. at 60; Def.'s Ex. 5.  Verkamp assigned Michael ratings of "Needs Improvement" in five out of seven total performance areas.  Def.'s Ex. 5.  Verkamp's primary complaints were that Michael had not completed assigned tasks in a timely manner and had not been submitted high quality work.  *Id.*  Specifically, Verkamp noted that Michael did not complete revisions to a training module known as "KIT 1" until two weeks after the deadline.  *Id.*; Michael Dep. at 62.  Verkamp also stated that the area Team Leader, Damian Journey ("Journey"), reviewed the KIT 1 submission and ordered that it be redone due to quality issues.  *Id.*; Michael Dep. at 64.  However, Journey had signed off on the KIT 1 submission prior to Michael's turning it in to Verkamp, and when Michael

5

sought to discuss Journey's concerns about the submission, Journey refused to speak with her.  Michael Dep. at 65-66.

The performance review also cited a need for Michael to provide constructive feedback and solutions instead of just grammatical feedback or questions with no solutions. Def.'s Ex. 5.  Michael had provided Verkamp with substantive feedback on a document the first time she was asked to do so, but Verkamp became defensive.  Michael Dep. at 71. Thereafter, Michael recanted and only provided grammatical feedback and pointed out deficiencies instead of suggesting solutions.  *Id.*  Next, Verkamp noted that Michael needed to improve her level of customer service.  *Id.*  Verkamp also stated that Michael needed to be "judicious in seeking operator assistance and input."  *Id.* at 73.  Finally, Verkamp noted that Michael needed to keep her supervisors informed on the status of her projects.  *Id.*

On February 20, 2007, Verkamp and a Lilly Human Resources Manager, Sabrina Martin, called Michael into a meeting and gave her a memorandum explaining that she was being placed on probation for six months.  Michael Dep. at 77-78; Def.'s Ex. 6.  The probation letter cited the September 20, 2002, parking warning, which had stated, "Any further incidences of parking violations, unsatisfactory performance, attendance, or conduct will lead to further disciplinary action, which may include probation or separation."  Def.'s Ex. 6; Def.'s Ex. 3.  The probation letter cited eight examples of Michael's performance deficiencies, including the accumulation of several parking tickets after being warned, failing to promptly record absence time, excessive tardiness and absences, excessive use of corporate computers for personal business, and failure to meet established deadlines and produce high quality work.  Def.'s Ex. 6.  The letter then outlined six specific performance expectations that Michael was expected to meet during the probation period.

*Id.* Specifically, Michael was expected to park in approved spaces, meet all deadlines, document meetings on computer calendar software or otherwise inform supervisors of her whereabouts, obtain prior approval for vacation and absences, and maintain a work schedule of 8:00 a.m. to 4:45 p.m. for the duration of the probation period. *Id.* Finally, the probation letter stated, "During this probationary period, your performance must be completely satisfactory or you will be subject to immediate dismissal." *Id.*

On March 16, 2007, Michael submitted FMLA paperwork to Lilly's medical department, seeking leave for depression for the period February 27, 2007, through April 17, 2007. Michael Dep. at 100, 104; Def.'s Ex. 7. The request for leave was prompted by the negative performance review and probation letter, which caused Michael stress and exacerbated her depression. Michael Dep. at 107-08. Michael had previously pre-paid for a non-refundable vacation to China, so her treating physician asked that she be allowed to take the vacation in the middle of her FMLA leave. *Id.* at 102-03. Lilly approved both the FMLA leave and the vacation. *Id.* at 103-04. Michael was on FMLA leave from February 27, 2007, to March 16, 2007, then on vacation, and then resumed FMLA leave from March 29, 2007, through April 17, 2007. *Id.*

While on FMLA leave, Michael went into the office on a Saturday morning to catch up on work. Michael Dep. at 162. An employee who observed Michael enter the building informed Verkamp. *Id.* Verkamp contacted Michael and told her that she was not to come into work while she was on approved leave. *Id.* at 161-63. Verkamp then contacted human resources and security, requesting that Michael's security badge be deactivated so that she could not access Lilly premises while on leave. Verkamp Aff. at ¶ 8; Michael Dep. at 163. When Michael returned to work at the end of her leave, Verkamp requested that security

reactivate her security badge so that she could again access the premises.  Verkamp Aff. at ¶ 8.  Michael's access to the building in which she worked was restored, but was inadvertently not restored for the other buildings on the Lilly campus, including Lilly's Corporate Center.  *Id.*

Approximately one week after Michael returned from leave, she met with Verkamp to review where things were with her outstanding projects.  Michael Dep. at 114.  During that meeting, Verkamp stated, "A lot of people are afraid to talk to you . . . They do [not] know how to interact with you anymore.  They do [not] know if you [are] crazy or what.  They [are] scared of you."  *Id.* at 115.

In the weeks after Michael's return from FMLA leave, Verkamp continued to be unhappy with Michael's performance.  Specifically, Verkamp noted that Michael's tardiness and absences continued to be a problem.  Verkamp Aff. at ¶ 11.  As Lilly's electronic access records demonstrate, Michael arrived at work late nineteen times bewteen Michael's return to work following FMLA leave and the end of her employment.  Hardin Aff., Ex. A.  On the days that Michael was late, she arrived to work an average of fifteen minutes after her probation-mandated start time of 8:00 a.m., but stayed past her quitting time of 4:45 p.m. by an average of nine minutes.  Hardin Aff., Ex. A.  Michael also worked approximately twelve hours on a Sunday and fifteen hours on Memorial Day during this time period.  *Id.*  Verkamp also noted that Michael had failed to log her meetings into the company's computer calendar software or otherwise inform Verkamp of her whereabouts, as required by the terms of her probation.  Verkamp Aff. at ¶ 9.  On at least three different occasions, Michael stepped away from her desk, telling Verkamp that she had meetings, but no meetings were posted on her calendar.  *Id.* at ¶¶ 10, 11.  Michael also missed a

8

deadline for a project by approximately six days.  *Id.* at ¶ 10.  Finally, Verkamp noted that the quality of Michael's work was not improving.  *Id.* at ¶ 11.

In light of Michael's continued performance deficiencies, Verkamp sought approval from Human Resources to terminate Michael's employment.  Verkamp Aff. at ¶ 12.  She initiated the process in mid-May, 2007, by reviewing with Martin and Lakin multiple violations of the expectations placed in Michael's probation letter.  *Id.*  All agreed that Michael had not met the requirements of probation and that termination was appropriate.  *Id.* at ¶ 8.  The group decided to offer Michael a voluntary resignation severance package and to terminate her employment if she refused to voluntarily resign.  Lakin Aff. at ¶ 14.

On May 23, 2007, Verkamp discussed her concerns with Michael in a meeting, but did not tell her at that time that her employment was being terminated.  Verkamp Aff. at ¶ 9.  During the meeting, Michael asked Verkamp how she was doing with her probation, and Verkamp stated that Michael was not doing well.  Michael Dep. at 132.  Shortly after the meeting between Michael and Verkamp, Michael asked Lakin if she could be moved to another cubicle, farther away from Verkamp's office.  *Id.* at 175.  She also asked Lakin if she could post for other positions within Lilly, because  "I had five successful years at Lilly and no complaints from other supervisors and [ ] I thought if I could find another place, I would be all right."  Michael Dep. at 144.   Lakin explained that Lilly policy prevented employees who were on probation from seeking other placements, and that, in addition, Lilly required an employee to stay in a position at least three years prior to posting for an internal transfer.  *Id.* at 144-45.

On Thursday, May 24, 2007, Lakin conveyed a severance offer to Michael that would apply if she voluntarily resigned from employment at Lilly.  Lakin Aff. at ¶ 9.  On the

afternoon of Friday, May 25, 2007, Michael had an appointment with Lilly Health Services, located in Lilly's Corporate Center.  Lakin Aff. at ¶ 10.  When she arrived at the Corporate Center and found that her security badge did not allow her to access the building, Michael assumed that her employment had been terminated.  Michael Dep. at 152.  After a security guard permitted Michael to enter the building, she went to her appointment at the health center.  *Id.* at 147.  While Michael was in the waiting room, she received a phone call from Lakin who told Michael that Verkamp did not know where she was and had inquired as to her whereabouts.  *Id.* at 149.  Because Lilly employees often have meetings at other campus locations, Michael was surprised that Verkamp would call Human Resources and have them "hunt [her] down."  *Id.* at 150.  Shocked and upset, Michael sent Lakin an email from the health center informing him that she had been unable to access the building and stating, "I would like to lodge a complaint against my supervisor for creating a hostile work environment and for harassment."  Lakin Aff., Ex. B; Michael Dep. at 151.  After her appointment, Michael gave her security badges to the guard at the security booth and left. Michael Dep. at 152.

The following Monday, Lakin called Michael, informed her that she had not been terminated, and asked her to come in and discuss her allegations of harassment.  Michael Dep. at 152.  Michael agreed to come in, and she and Lakin had a meeting during which Michael gave several reasons why she felt that Verkamp harassed her.  *Id.* at 153-54. First, after coming back from FMLA leave, Michael overheard Verkamp talking to a coworker about Verkamp's daughter, and during the conversation Verkamp raised her voice and said, "I mean, the girl is psycho."  *Id.* at 110.  Although Verkamp was not speaking to her, Michael assumed that the mention of "psycho" was directed at her

because she had never before heard Verkamp use the terms "psycho" or "crazy" to refer to people.  *Id.* at 111.  In explaining why she thought the word was being used in her presence, Michael stated:

> [Verkamp] raised her voice on that word because she knew I was sitting there.  I thought perhaps she would be sensitive, due to the fact that I'd just come back from a leave due to mental disability, that that might be a word she would choose to not use.

*Id.* at 112.  Secondly, Michael felt she was being harassed by Verkamp because Verkamp skipped over her in a staff meeting two days after Michael came back from leave.  *Id.* at 154.  Verkamp had gone around the room, asking for reports and updates from different employees on the status of various projects, but stopped before she got to Michael and called the meeting to a close.  Michael Dep. at 154.  Finally, Michael felt that Verkamp did not apply Lilly policies equally to all of the members of her team and objected to the characterization of her work as "not meeting deadlines."  *Id.* at 155-56.  Michael pointed out that Verkamp had faulted her for not timely completing a project requiring the development of updated process maps for manufacturing, yet the process maps for packaging and quality, which were the responsibility of other employees, had still not been completed.  *Id.* at 156.

At the end of the meeting, Michael requested approval from Lakin to take the week off as vacation while the investigation into her harassment claims was pending.  *Id.* at 157.  She then sent Lakin an email, dated May 28, 2007, in which she refuted the severance package offer and stated the she considered herself terminated on either Friday, May 25, 2007, or Tuesday, May 29, 2007.  Lakin investigated Michael's claims by interviewing Verkamp and several coworkers whom Michael had identified as supporting her allegations.

Lakin Aff. at ¶ 13.  Lakin found that the discussion about Verkamp's daughter had been in reference to the fact that Verkamp's daughter was in the habit of completing her homework and then neglecting to turn it in, and that the "psycho" comment was not directed at, nor in any way referencing, Michael.  *Id.* at ¶ 12;13.  He also found that Verkamp had not intended to slight Michael during the staff meeting, but had simply assumed that Michael would have nothing to report as she had just returned from leave and had not been working on any projects.  *Id.* at 13.  Indeed, upon learning that Michael's feelings had been hurt, Verkamp apologized to Michael.  *Id.*  Michael, however, did not find the apology to be genuine.  Michael Dep. at 155.  Finally, Lakin found that Verkamp's assessment of Michael's deficient performance was warranted.  Lakin Aff. at ¶ 13.  Accordingly, Lakin notified Michael that he had investigated her complaint of harassment and found it to be unsubstantiated.

On June 1, 2007, Lilly informed Michael that her employment with the company had been terminated.  Lakin Aff. at ¶ 14.

## II. <u>STANDARD</u>

Summary judgment is not "a disfavored procedural shortcut, but rather [is] an integral part of the [f]ederal [r]ules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action" (internal quotations omitted).  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1); *United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990) (citing *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989)).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which provides

12

in relevant part:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on final, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c)(2).  Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which set forth "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co., Ltd.  v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to "scour the record in search of evidence to defeat a motion for summary judgment"; rather, the nonmoving party bears the responsibility of identifying the evidence upon which it relies.  *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996) (citing *Williams v. Ramos*, 71 F.3d 1246, 1248 (7th Cir. 1995)).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*,

477 U.S. at 248; *JPM, Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996) (citing *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986 (7th Cir. 1993)). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *Clifton v. Shafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to h[er] case, one on which [s]he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996) (citing *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).

## III. <u>DISCUSSION</u>

### A. MICHAEL'S FMLA CLAIM

The FMLA secures for qualified employees a right to take up to twelve weeks of leave per year from their employment for, among other things, caring for an ill family member, giving birth, or recuperating from a serious health condition that renders the employee unable to work. 29 U.S.C. § 2612(a)(1). Employers are prohibited from retaliating against an employee for exercising his or her entitlement to medical leave under the FMLA. *Id.* § 2615(a)(1). The FMLA provides for a private cause of action against an employer for violation of its provisions. *Id.* § 2617(a)(2).

FMLA retaliation claims are evaluated under the same framework used for retaliation claims under other employment statutes. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (citing *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999)). Thus, an employee in an FMLA retaliation suit can proceed under two distinct legal

14

theories of proof, the direct method or the indirect method. *Id.* Michael has elected to proceed under the direct method of proof for her FMLA retaliation claim.

"Under the direct method, [Michael] must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007)). The required elements under the direct method can be established by direct or circumstantial evidence. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 735 (7th Cir. 1994). "[D]irect evidence is evidence which, if believed by the finder of fact, will prove the particular fact in question without reliance upon inference or presumption." *Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.,* 344 F.3d 680, 689 (7th Cir. 2003) (quoting *Plair v. E.J. Branch & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997)) (internal quotations omitted). "Direct evidence usually requires an admission by the decisionmaker that his actions were based on [the protected status]." *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2003) (citing *Troupe*, 20 F.3d at 736). Alternatively, a claimant can construct "a convincing mosaic of circumstantial evidence that allows [the factfinder] to infer intentional discrimination by the decisionmaker." *Ridings*, 537 F.3d at 771 (citing *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006)). "[C]ircumstantial evidence of a causal connection comes in three flavors: (1) suspicious timing; (2) evidence that similarly situated employees were treated differently; and (3) evidence that the employee did not deserve the punishment and that the employer's reason for the punishment is a pretext for discrimination." *Hayman v. Potter*, 598 F. Supp. 2d. 904, 913 (N.D. Ind. 2009) (citing *Volovsek*, 344 F.3d at 689-90).

15

The parties do not dispute that Michael is a "qualified employee" and Lilly is an "employer" for purposes of the FMLA.  Likewise, the parties do not dispute that Michael engaged in statutorily protected activity by requesting and taking FMLA leave and that she suffered an adverse employment action when Lilly terminated her employment.  Therefore, this case turns on whether Michael has designated sufficient evidence to allow a jury to reasonably infer that Lilly terminated her in retaliation for taking FMLA leave.

To support her contention that Lilly fired her because she took FMLA leave, Michael offers the following pieces of circumstantial evidence:  (1) the timing of her termination, approximately one month after returning from leave; (2) the deactivation of Michael's security badge while she was on leave and Lilly's failure to reactivate it upon her return; (3) that her performance evaluations were satisfactory prior to Verkamp becoming her supervisor; (4) Verkamp's comments to Michael after she returned from leave that other employees were scared of her; (5) Verkamp's use of the word "psycho" in Michael's presence; (6) that the terms of Michael's probation required her to be at work one hour before the rest of the employees; (7) that other employees were not disciplined for parking in unauthorized spaces; and (8) that other employees were not reprimanded for using company computers for personal use.  This Court discusses each piece of evidence in turn.

Michael submits the first five pieces of evidence to demonstrate that the timing of Michael's termination was suspicious.  Suspicious timing alone is rarely sufficient to establish a causal connection, unless the adverse employment action comes immediately after the employee has engaged in protected activity.  *Compare Turner v. ABT Elec., Inc.*, 254 F. Supp. 2d 1018, 1020-21 (N.D. Ill. 2003) (one month gap insufficient to establish causal connection for retaliation claim), *and Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913,

16

919 (7th Cir. 2000) (three month gap insufficient), *with King*, 166 F.3d at 893 (one day gap between returning from FMLA leave and termination sufficient). Here, Michael was terminated approximately six weeks after returning from FMLA leave. There is simply too long a stretch between Michael's return from FMLA leave and her termination to support an inference of retaliatory intent.

Further, where the events that set disciplinary decisions in motion preceded the FMLA leave, courts have found that there is no suspicious timing supporting a retaliation claim. *See Long v. Teachers' Retirement System of the State of Illinois*, 585 F.3d 344, 354 (7th Cir. 2009) ("While a sudden decline in performance evaluations after an employee engages in a protected activity may provide circumstantial evidence of discriminatory intent, a decline in performance before the employee engages in protected activity does not allow for an inference of retaliation"); *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 811 (7thCir. 2005) (finding claimant's suspicious timing argument illogical where error at issue occurred before the claimed protected activity); *Buie*, 366 F.3d at 506-07 (noting lack of suspicious timing where plaintiff was on the brink of termination before the protected activity at issue). Here, Verkamp gave Michael a poor performance evaluation and placed her on probation prior to Michael's exercise of her right to take FMLA leave. In fact, Michael admitted in her deposition that the performance evaluation and subsequent probation prompted her to request FMLA leave. Thus, Michael's request for FMLA leave did not prompt a poor performance evaluation, probation, and eventual termination; rather, it was Michael's poor performance evaluation and probation that caused her to request FMLA leave.

Finally, Michael offers no evidence to connect Verkamp's comments that other employees did not know how to act around Michael with her termination some six weeks later. While the comment was certainly untoward, unless it was made contemporaneously with or otherwise connected to Michael's termination it falls into the category of "stray remarks." *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 667 (7th Cir. 2008); *Nichols v. Southern Ill. Univ.-Edwardsville*, 510 F.3d 772, 781-82 (7th Cir. 2007) ("Stray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment."). As for Verkamp's comment about her daughter being "psycho," Michael offers no rebuttal, aside from her own speculation, to Lakin's finding during the harassment investigation that the comment was in no way a reference to Michael. Similarly, Michael offers no evidence other than her own assumptions that her security badge was deactivated because she was being terminated. Michael doubts Lilly's explanation that its security office had simply made an error and failed to reinstate access to the Corporate Center when it reinstated Michael's access to the IndyDry facility following her leave. But mere doubts are not evidence. Speculation, standing alone, will not defeat a motion for summary judgment. *See McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion"); *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997) ("Facts, not an employee's perceptions and feelings, are required to support a discrimination claim").

The remaining proffered evidence is offered to show that Michael was treated differently than similarly situated employees. A claimant alleging that similarly situated employees were treated differently bears the burden of showing that the comparable

employees are similar to the claimant in terms of performance, qualifications, and conduct. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000).  "This normally entails a showing that the . . . employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Id.* (internal citations omitted).

Michael alleges that she was treated differently in three respects: (1) other employees regularly violated Lilly's parking policy and were not disciplined for it; (2) other employees used company computers for personal use and were not reprimanded; and (3) no other professional employee at the IndyDry facility was required to be in the office by 8:00 a.m.  Michael contends that two other professional employees at the IndyDry facility, Susan Wright and Annie Scott, arrived late for work on a regular basis and did not suffer adverse employment actions for this conduct.  It should be noted that the relevant comparison here is to similarly situated employees who were treated more favorably and did not take FMLA leave, not to similarly situated employees who were treated more favorably and were not put on probation.  *Burnett v. LFW Inc.*, 472 F.3d 471, 481-82 (7th Cir. 2006) ("[The employee] must show that after taking FMLA leave . . . he was treated less favorably than other similarly situated employees who did not take FMLA leave").  As a preliminary matter, no meaningful comparison can be made between Michael and similarly situated employees with regard to parking or computer use because Michael does not offer the names of specific employees who violated Lilly's parking or computer use policies but did not take FMLA leave.  Even if she had offered specific names, the areas where Michael was allegedly treated differently than her comparable coworkers–with regard

19

to parking, arrival time, and computer use–were all items included in her probation memorandum.   In other words, the fact that Michael was being evaluated by her supervisors under a specific set of performance standards as a result of her probation precludes any meaningful comparison because she was not under the same standards as the other employees.   "Without meaningful comparison data, there simply is not enough circumstantial evidence from which a reasonable jury could conclude that [the employer] fired [the employee] because he took FMLA leave." *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 952 (7thCir. 2006).   Once the speculative and unsupported evidence is removed, it is apparent that Michael supports her FMLA retaliation claim with timing alone. Therefore, Lilly's Motion for Summary Judgment as to Michael's FMLA retaliation claim is **GRANTED**.

## B.  ADA CLAIM

Michael asserts that Lilly retaliated against her in violation of the ADA for requesting a transfer to another supervisor.   As with the FMLA, Michael proceeds under the direct method of proof on her ADA retaliation claims.   Therefore, Michael must show that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action; and (3) a causal connection between the two.

Michael's claim fails under the first prong.   The only evidence upon which Michael relies to prove she engaged in a statutorily protected activity is her deposition testimony in which she described the transfer request she submitted to Lakin.   Michael Dep. at 141-144. The entirety of this description is as follows:

Q.      What happened, and what was the discussion that was had?

A:      Very little.  Sabrina –and, again, I am unsure of the exact dates, but Sabrina was beginning to transfer out of the HR area.  She got a position in Basing stoke.
        So I had asked to be allowed to transfer on the basis that I had five successful years at Lilly and no complaints from other supervisors and that I thought if could find another place, I would be all right.

*Id.* at 144.  Even assuming this excerpt accurately summarized the content of Michael's conversation with Lakin, merely requesting to be transferred to another supervisor, without linking the request to her alleged disability and need for an accommodation, does not qualify as a "statutorily protected activity."  The record evidences identified by Michael to establish that she engaged in statutorily protected activity is insufficient to survive Lilly's Motion for Summary Judgment.  Moreover, the Court's conclusions with respect to the allegedly suspicious timing of Lilly's decision and Michael's proffered comparators as to Michael's FMLA claim apply equally here.  Ultimately, no reasonable juror could review the designated evidence and conclude that Lilly unlawfully retaliated against Michael's under the ADA.  Lilly's Motion for Summary Judgment as to Michael's ADA retaliation claim is **GRANTED**.

**I**

## V.  <u>CONCLUSION</u>

For the foregoing reasons, defendant's, Eli Lilly and Company, Motion for Summary Judgment (Dkt. No. 38) is **GRANTED**.  Judgment shall be entered accordingly.

IT IS SO ORDERED this 13th day of May, 2010.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution to:

Johane J. Domersant
BAKER & DANIELS, LLP
johane.domersant@bakerd.com

Brian R. Garrison
BAKER & DANIELS - Indianapolis
brian.garrison@bakerd.com

Edward E. Hollis
BAKER & DANIELS - Indianapolis
eehollis@bakerd.com

Denise K. LaRue
HASKIN LAUTER  & LARUE
dlarue@hlllaw.com

Jay  Meisenhelder
HASKIN LAUTER  & LARUE
jmeisenhelder@hlllaw.com